B7STIEC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MELISSA TIERNEY, et al.,

4                   Plaintiffs,

5             v.                          14 Civ. 2926 (VEC)

6   SIRIUS XM RADIO, INC.,

7                   Defendant.

8   ------------------------------x
                                         New York, N.Y.
9                                        November 7, 2014
                                         2:30 p.m.
10
    Before:
11
                      HON. VALERIE E. CAPRONI,
12
                                            District Judge
13
                              APPEARANCES
14
    VIRGINIA & AMBINDER, LLP
15       Attorneys for Plaintiffs
    BY:  LADONNA M. LUSHER
16       LLOYD AMBINDER
         and
17  LEEDS BROWN LAW, P.C.
         Attorneys for Plaintiffs
18  BY:  BRETT COHEN

19  JONES DAY
         Attorneys for Defendant
20  BY:  MATTHEW W. LAMPE
         EMILIE A. HENDEE
21

22

23

24

25

B7STIEC

1          (Case called)

2          THE COURT:  Mr. Ambinder, this is your motion.

3          MR. AMBINDER:  It is my motion.  It will be Ms. Lusher

4    who will be giving the oral argument today.

5          THE COURT:  You are just here as an observer?

6          MR. AMBINDER:  Just watching.  I enjoy the show.

7          MS. LUSHER:  Good afternoon, your Honor.

8          We have made a notice for court-ordered opt-in

9    plaintiffs.  We allege that the plaintiffs have submitted

10   evidence that shows a common policy to replace paid workers

11   with unpaid interns.  We feel that the evidence we submitted

12   shows that plaintiffs have alleged a common policy of that,

13   enough to be generalized for notice to be sent to other

14   potential complaints to advise them of this lawsuit, and that

15   there is evidence of a highly centralized internship program

16   that is controlled by the human resourced department at Sirius.

17         Specifically, as far as going to the evidence of the

18   similar tasks that the plaintiffs performed, we have submitted

19   job postings and blog postings from current and former interns

20   that show that no matter the department and no matter the

21   location, they performed similar tasks, and that these were

22   tasks that were also performed by compensated employees in the

23   same department where they worked.

24         THE COURT:  Let me ask you, in that regard, it struck

25   me that there was a lot of similarity, recognizing that if

B7STIEC

you're working on the Howard Stern Show, you're probably going
to be doing slightly different things than if you are working
on NFL Today.  Within sort of broad parameters, the people who
were working on shows or in particular departments of
programming, there seem to be general similarities in what they
did.

But people who were working in what I would view as
kind of the back office type of department, so HR or finance, I
think either you or Jones Day gave me affidavits from somebody
who worked in finance.  That seemed to be very different.
Those two groups of interns seemed to be doing different
things.

Could you focus on that?

MS. LUSHER:  Absolutely.  I do believe that your Honor
was right, as far as the programming and things like that,
there are such commonalities, as far as running the
soundboards, editing audio clips, screening on-show callers.

Some of the other tasks that these individuals
performed also, though, were conducting research or inputting
information that you could actually generalize to being date
entry and conducting research for whatever the on-show callers
were going to be discussing or asking questions about.

Those are also some of the things that our named
plaintiffs, Melissa Tierney, did on the Howard Stern Show.  She
did research.

B7STIEC

1          THE COURT:  Assume you have got me on that.

2          MS. LUSHER:  Okay.

3          THE COURT:  Address, really, the distinction, though,

4     between the departments that would be like HR and finance.

5          MS. LUSHER:  Sure.

6          THE COURT:  My old company would have been legal.

7     That would be different than the people who are dealing with

8     the radio shows themselves.

9          MS. LUSHER:  Absolutely.

10          So I think some of the commonality is that, as the

11     named plaintiffs and opt-in plaintiffs alleged, even the

12     individuals in HR and finance are doing -- the overall theme is

13     that they were performing tasks that compensated employees in

14     their same department were performing.

15          These are also generally tasks of entry-level

16     employees.  So a couple of the people in the finance or HR

17     department talked about using Microsoft Excel.  They talked

18     about doing data entry.  You could say that there were also

19     individuals that were in these other programming departments

20     that were inputting data into computer databases.  It may not

21     have been Microsoft Excel spreadsheets, it might have been a

22     different software program, but it was generally an entry-level

23     task of an employee that would have been compensated in the

24     department where they worked.

25          I think that was recognized by the court in Grant v.

B7STIEC

1   Warner Brothers Music, and also pointed out by Judge Nathan in

2   Mark v. Gawker Media.  Actually, it is not pointed out in the

3   decision, but in Ojeda v. Viacom, the named plaintiffs there,

4   one of them worked in the web content department, where it was

5   digital web marketing, that was Mr. Ojeda.  The other named

6   plaintiff, Ms. Reynaga, worked in the HR department in

7   California.  And that action was actually certified so that a

8   notice could go out to the potential opt-ins.

9          In Grant, you had different individuals that worked in

10  different departments, such as pop promotions, there was

11  another individual that worked in the urban artist and

12  repertoire division, someone else worked in the business

13  analytics division.  But, again, Judge Gardephe, in that case,

14  found that the plaintiffs have showed a common policy that

15  unpaid interns were doing the same work as compensated

16  employees in their department.

17         And, in fact, in Grant, he specifically noted that the

18  fact that the named plaintiff Grant's duties differed from one

19  of the opt-in plaintiffs, Mr. Westerkon, was not what was the

20  main inquiry.  The main inquiry was whether or not the

21  plaintiffs had put forth enough evidence to send out a notice

22  to other plaintiffs saying that the common allegation was we

23  have performed work in our departments that compensated

24  employees worked, but we weren't paid.

25         I also think it is important to point out, this is

B7STIEC

```
1    also in Grant, that the defendants uniformly made an exception
2    for all unpaid interns without looking at the individual duties
3    that they do.  So they don't examine on a day-to-day basis what
4    these individuals are doing, they just say you're automatically
5    exempt.  It is almost like, on the one hand, automatically
6    exempting them without examining their different duties, but
7    then on an opposition to a motion for 216(b), they want to
8    highlight these differences.  The court in Grant recognized
9    that as well.
10           I think that another important factor is to show the
11   highly centralized HR program.  Here, they have submitted the
12   affirmation from Bonnie Yuen, who concedes that the program is
13   centralized through HR.  HR originally screens these people.
14   These people apply through a centralized website.  The website
15   has postings for all the locations where Sirius interns are
16   going to work, then the website descriptions are the same, no
17   matter if you're a music programmer in New York or you're a
18   music programmer in Washington, DC, you're performing the same
19   exact duties.
20           There are blog postings by interns that have performed
21   internships in those particular areas, and they stay the same
22   from year to year.  The other interesting factor that we put
23   evidence forth is that HR will put up job postings where some
24   of these same tasks are being advertised in a paid employment
25   position, but they're the same tasks that these interns have
```

B7STIEC

1    been doing in their unpaid internship.

2          HR, once they evaluate the application, they make the

3    first initial phone call, they screen the applicant, they go

4    over their resume, they discuss with them what their interests

5    are, they collect all of the internship request forms from the

6    different departments, and then they decide who gets sent out

7    to which department for an interview by that department.

8          The interns have to turn in weekly journal entries to

9    the HR department.  No department is allowed to hire an intern

10   without HR's approval, so it is very highly centralized.  They

11   also, HR, has mandatory requirements that they tell the intern

12   that they're going to be working a certain number of hours, a

13   certain number of weeks, and that the internship is unpaid and

14   for academic credit only.

15         All of this is handled through the HR department

16   before it even gets to the department.  This is a routine

17   practice that happens with all interns, no matter where they're

18   located in which department, and whether they're working for a

19   channel or a show or whatever.  These were things that were

20   definitely recognized by the court in Ojeda.  They were

21   recognized by the court in Grant.  It was also recognized by

22   the court in Mark v. Gawker Media.

23         So this is the type of evidence that courts have

24   looked at and realized that it was sufficient to -- I really

25   like Judge Nathan's quote where she says that it is basically

B7STIEC

enough evidence to show that you could generalize the same

allegations to interns enough to send out a notice, just to let

other individuals be aware that there's an action.

You know, one point that I would like to make that I

think is important in these cases, is that interns work for a

very limited amount of time.  Sending out a notice, I think, in

these cases is even more important, because if you only worked

for someone for 15 weeks or 10 weeks, your claim is much more

susceptible to expiration if a notice doesn't go out quickly so

that you can stop that statute of limitations from ticking.

So that is all we want to do is to simply send out a

notice to inform people of this.  The only other thing I will

touch on, unless you have any more specific questions, as far

as the defendant's evidence goes, there are multiple decisions

that talk about how the court isn't to examine credibility and

to make factual determinations at this stage.

While courts have talked about how there is the 60 DOL

factors and the examination of those of whether or not you

qualify as an unpaid intern under the DOL factors.  It is our

position, along with several other courts, it's too premature

to examine that at this point, because it does get into the

merits of those arguments.  Although the defendants have put

forth affidavits from several people, four of those affidavits

came from current interns, so it is our position that they're

highly suspect because these are people that were conveniently

B7STIEC

 1    in the internship program at the time.  There is no evidence as

 2    to whether or not Sirius has changed their internship program

 3    since this lawsuit has been filed.  But these are also

 4    potential claimants, and they may not have realized what they

 5    were saying or what kind of rights they could be potentially

 6    releasing by putting in these affidavits.

 7         Three of the other affidavits were put in by current

 8    Sirius employees, even though they don't say that.  We

 9    submitted evidence to show those three individuals performed

10    internships at one time and are now currently working for

11    Sirius.  They are reliant on Sirius for their employment.  Of

12    course, if found, in Gortat v. Capala Brothers, those

13    affidavits can be highly suspect from current employees.

14         Then the last affidavit is from an individual who

15    doesn't appear to be a current Sirius employee, but did a

16    couple number of internships for Sirius.  All I can say about

17    that individual is he looked like he had a wonderful

18    experience.  It also looks like he may be still be tied in the

19    industry.  We have talked to a number of interns through

20    several cases that people are afraid to come forward if they

21    still have networks and contacts in the industry, and they're

22    afraid to put their name out there.

23         We don't feel that the evidence that Sirius has put

24    forth is enough that would warrant this court not issuing

25    notice to people, just to let them know there is a lawsuit out

B7STIEC

1    there that they can participate in.  We do feel we have met the

2    standard under the statute to warrant this first stage of the

3    notice stage.

4              THE COURT:  Thank you.

5              Mr. Mr. Lampe.

6              MR. LAMPE:  Thank you, your Honor.

7              The plaintiff is seeking conditional certification and

8    she does carry a burden of proof.

9              THE COURT:  But you agree that it is a low burden?

10             MR. LAMPE:  It is a low burden, your Honor.

11             THE COURT:  Not no burden, but it is a low burden.

12             MR. LAMPE:  It is a low burden, but it is not a

13   nonexistent burden, and it is an evidentiary burden.

14             The Meyers, Second Circuit case, outlines what that

15   burdens is.  The plaintiff has to come forth with evidence

16   sufficient to allow for an inference of a classwide policy or

17   practice and sufficient to allow for the inference that the

18   classwide policy or practice is unlawful in some way.  That is

19   the plaintiff's evidentiary burden.

20             The plaintiff's evidence in this case, your Honor, is

21   very thin.  There are four declarations, very short, very

22   generalized, very perfunctory, that include language identical

23   to language that this court has found insufficient to justify

24   conditional certification.

25             The bulk of the rest of their evidence are blog posts,

B7STIEC

1    not sworn testimony, not for the purpose of presenting evidence

2    on issues relevant to conditional certification, but a series

3    of blog posts.  So while the plaintiff's evidence is thin,

4    their ask is very big.  You alluded to it, your Honor.  They're

5    asking for conditional certification that would extend to

6    168 different departments, channels, and shows, ranging from

7    everything from on the department side to HR to IT, or to on

8    the show side, The Howard Stern Show, where the plaintiff

9    herself was an intern.

10          Our view is that the evidence the plaintiff has

11    submitted is either not classwide or is either not even

12    suggestive of anything unlawful.  And I would like to go

13    through, if I could some of the points that I think are very

14    important to focus on.

15          First of all, there is this refrain mainly in the

16    reply brief, but it is in the opening brief as well, about how

17    the interns performed work done by paid employees.  The

18    plaintiffs seem to be making the point that that somehow or

19    other is suggestive of something unlawful.  That argument, your

20    Honor, overlooks the seminal decision in this entire area of

21    law, which is the Supreme Court's case in Walling v. Portland

22    Terminal.

23          That case dealt with yard brakemen who performed the

24    same work as paid employees.  The Supreme Court in this case

25    said, those yard brakemen qualified as interns, and the court

B7STIEC

talks about what they did.  They first observed the paid

employees doing the work, then they moved to actually

performing the actual work duties themselves under close

supervision.  The fact that in all four of the plaintiffs'

declarations, they have a statement that says, I performed the

same work as paid employees in my department, is of no legal

moment.  That is not disqualifying.  It is not suggestive of

anything unlawful, and that is all the statement is.

There is no factual support for what that means.  They

don't get into any of the details of it.  It is just the bare

naked statement, I performed the same work as employees in my

department.  So did the yard brakemen that the Supreme Court

found to be interns as classified in the Walling case.

Let me turn to an allegation that the plaintiff raised

in their brief about not working under close supervision.

Plaintiff Tierney herself makes this allegation, but she has

put forth no evidence that there is any sort of persuasive lack

of supervision among the internship program.  Of the four

declarations submitted, two of them don't make that allegation;

two do.  So there is not even agreement within the four

declarants as to whether or not they had very little

supervision or very little oversight.

Plaintiffs' counsel are very experienced in these

cases, your Honor.  They brought a number of these cases.  They

definitely know what they are doing.  And if those other two

B7STIEC

1   interns who submitted declarations were able to say, I worked

2   with very little supervision, I'm sure they would have said it.

3   So there is no uniformity among the plaintiffs' witnesses with

4   respect to that allegation.

5          Moreover, if you look at what Ms. Tierney says about

6   her particular job, her allegations, your Honor, are that she

7   spent most of her time running errands, getting breakfast

8   orders, delivering food.  It would stand a reason, if that were

9   true -- and we are not conceding that it is -- if that were

10  true, it would stand to reason that this did not require a lot

11  of oversight.  It didn't require a lot of supervision.

12         But she is a real outlier with respect to that.  If

13  you look at the other declarations that she submits, and you

14  compare Ms. Tierney's duties to the other duties of her own

15  declarants -- again, these are her own witnesses -- for two of

16  those witnesses, Vitetta and Miller, there is zero overlap.

17  Ms. Tierney identifies six or seven things that she does.

18  Vitetta and Miller identify six or seven things that they do.

19  Zero overlap; not a single item common.

20         Your Honor, to your point earlier about understanding

21  or thinking there might be similarities and duties within the

22  shows; Vitetta is in music programming, Miller was in the

23  sports department programming.

24         THE COURT:  Yeah, but to say there is no overlap, I

25  think that you are overstating your case.  While they may not

B7STIEC

1    use the exact same language to describe what they were doing, I

2    walked away from reading your affidavits thinking --

3    recognizing that they were working for different shows or

4    different programs, they were essentially doing the same sort

5    of low-level, entry-level radio show type work.

6             MR. LAMPE:  Well, your Honor, if I can push back

7    gently.

8             THE COURT:  Sure.  You can push back as hard as you

9    would like.  I don't take offense.  Tell me what you're going

10   to refer to.

11            MR. LAMPE:  I'm talking about the Vitetta declaration.

12   This is Exhibit H to the first Ambinder affidavit.

13            THE COURT:  H?

14            MR. LAMPE:  Some of these duties are not what I would

15   consider grunt work, messenger work.  Among the things that

16   this individual did was preparing content to go on airwaves,

17   adding new music, analyzing data, completing reports,

18   completing forms for royalties, uploading and preparing

19   content.

20            If you compare that to Ms. Tierney's declaration, she

21   basically sounds and characterizes herself as a messenger:

22   Running errands, placing orders, obtaining breakfast orders,

23   delivering food items to on-air personality.  She does say she

24   reviewed news clips.  She reported to on-air personalities and

25   the only other things are compiling data and obtaining

B7STIEC

1   signatures.  These two individuals, both on the programming

2   side, on the show side, are very differently situated in my

3   view.  I would ask the court to reconsider the degree of

4   similarity, even within the people who are not on the

5   department side, like HR, and procurement and the like.

6         There is, in the four declarations from the

7   plaintiffs, your Honor, the common statement, it is identical

8   in all four, it says:  If I had not performed the various tasks

9   I was assigned, Sirius would have had to hire a paid employee

10   to do them.  If you sub out the word Sirius for the word MSG,

11   that is the exact statement in the exact declarations that this

12   court in the MSG case found conclusory, unsupported, and

13   incapable of justifying conditional certification.

14         That is not even as if that case came out after this

15   declaration was submitted.  The MSG case came out in May.

16   Plaintiffs submitted this declaration with this sentence, which

17   they, I am sure, view as significant, in July.  So the court

18   has already rejected this as a basis to justify conditional

19   certification.

20         THE COURT:  It is significant because you can't use an

21   internship program to substitute for employees that you would

22   pay.

23         MR. LAMPE:  Judge Berman's point with respect to that

24   is conclusory and it is unsupported.  It is just a bare

25   statement.  No factual explanation for how they would know that

B7STIEC

1    or what they mean by that.  It is a bare naked assertion.  And

2    the Meyers case says, Second Circuit, that while they have a

3    low evidentiary burden, unsupported assertions do not qualify.

4           Similarly, your Honor, there is the statement in all

5    four of the declarations:  I know that Sirius treated other

6    interns in the same manner similar to me based on my

7    observations as well as discussions we often had among

8    ourselves.  Sub out MSG for Sirius, and that identical

9    statement was quoted and rejected in the MSG case by this court

10   as insufficient to justify conditional certification.

11          Now, with respect to the similar work duties,

12   plaintiff in their brief at the very beginning of their opening

13   brief, pages three through six, they talk similarities of duty.

14   If you read carefully those pages though, all plaintiff is able

15   to say is that there are similarities within departments.

16          Plaintiff talks about how her duties in The Howard

17   Stern Show are similar to other duties in The Howard Stern

18   Show.  She talks about how the duties in the music programming

19   group in New York are similar to the music programming duties

20   in Washington, DC.  She talks about how the duties in talent

21   relations, those duties are consistent over time.

22          Claiming that there is similarity within departments

23   is a poor substitute for attempting to demonstrate similarity

24   across 168 departments.

25          THE COURT:  Would you concede that there is sufficient

B7STIEC

1    evidence for a collective action for people that are in the

2    radio programming department?

3              MR. LAMPE:  No, your Honor, not even close.  You agree

4    it is a better case.  The plaintiff can show more similar

5    duties to be sure, but the Meyers case says there has to be

6    evidence of commonality classwide and some indication that it

7    is unlawful.  The plaintiffs seem to think that they are doing

8    the work of paid employees, that that makes it unlawful.  This

9    area of law is a little bit unsettled.  There is nothing

10   unsettled about the Walling Supreme court case.  That was the

11   case that performing the duties of the paid employees was not

12   disqualifying.  It stands to reason --

13             THE COURT:  Do you agree you can't use a internship

14   program to substitute what otherwise would be paid employees?

15             MR. LAMPE:  I totally agree.  That is certainly true.

16   Plaintiffs have no evidence that that happened, other than

17   those unadorned, conclusory statements that this court verbatim

18   read, quoted, and rejected as sufficient.  This case does

19   not --

20             THE COURT:  They haven't done discovery yet.

21             MR. LAMPE:  I understand that, your Honor.  The

22   plaintiff is in charge of when they bring this motion.  There

23   has been no discovery.  The court should hold the plaintiff to

24   the plaintiff's evidence at this stage.  And it wasn't our

25   choice as to when the plaintiff would bring this motion, and

B7STIEC

1    there is no evidence.

2              THE COURT:  Of course not.  On the other hand, for the

3    most part, the courts allowed the collective notice to go

4    forward before there has been full merits discovery.

5              MR. LAMPE:  I understand that, your Honor.  I

6    certainly understand that.  That is why Meyers says the burden

7    is low.  Meyers says there is an evidentiary burden.

8    Nonetheless, the cases from this court talk about the fact that

9    is a burden that should be monitored with some degree of care

10   because there is a massive expansion of the litigation that is

11   hanging in the bounds here.  If the court issues notice, people

12   opt into the case.  That is expense, that's burdensome, that's

13   time, and it is --

14             THE COURT:  It is a balancing test, though.  If, in

15   fact, it is an unlawful internship program because Sirius is

16   using volunteers to do the work that they would otherwise hire

17   employees to do, doing it via collective action is considerably

18   more efficient, from the court's perspective, than to do lots

19   of individual cases.

20             I appreciate the burden on the company.  I really do.

21   I'm sensitive to the issue of that balance.  The question

22   really is whether they've gotten over what is a low threshold

23   to get there.

24             MR. LAMPE:  Our view is that they have not.

25             THE COURT:  Understood.

B7STIEC

1          MR. LAMPE:  This case does not have the features that

2     you find in some of the other cases that the plaintiffs are

3     relying upon.  For instance, Grant we heard quite a bit about.

4     Grant was a case where the court indicated that every

5     department, the different departments that Ms. Lusher referred

6     to, they all had the identical position description.

7          In that identical position description was the

8     statement that the interns, during the course of their

9     internship, would work on a project to address business needs.

10    You have commonality and you have arguable unlawfulness in this

11    case.  You don't have either here.

12         The position descriptions in this case are not the

13    same.  They are different.  Every department, every position,

14    they differ.  The plaintiff has put a few in the record so the

15    court can look at the difference between The Howard Stern Show

16    and the music programming show internships; different duties,

17    different responsibilities listed.

18         THE COURT:  But how different are they really?  I

19    mean, your argument seems to me to the extreme that any company

20    that has multiple departments kind of, per se, can be subject

21    to a collective action because depending on how diligent their

22    HR officers are, you're going to have somewhat different

23    position descriptions.

24         So an introductory financial analyst is going to have

25    a different job description than an introductory HR employee.

B7STIEC

Surely you're not saying that those differences, in terms of
what, from a department perspective, what an entry-level
employee would do may flow down to what an intern would do,
that that alone means their jobs are sufficiently different --

             MR. LAMPE:  No.

             THE COURT:  -- so it can't be a collective action?

             MR. LAMPE:  Not at all, your Honor.  The plaintiffs
don't have to prove the conditional certification case on
position descriptions.  They're not required to show
similarity.  This plaintiff can't.  That's significant because
she is claiming that there is similarity.  I wanted to point
that out.  But I am certainly not arguing to your point, that
that is the only way they can prove conditional certification.

             The way that the plaintiffs in the cases that this
plaintiff relies upon has shown has justified conditional
certification in the past are things that are emanating from
the company.  The position descriptions in Grant that contain
the reference to addressing business needs.  In the Wang
case --

             THE COURT:  Which case?

             MR. LAMPE:  The Wang v. Hearst with Judge Baer,
internal company e-mail indicating that there was a need to cut
back on paid messengers and that the gap would be made up with
the interns.

             THE COURT:  Yeah, I like that case.

B7STIEC

1          MR. LAMPE:  There is no evidence like that here.  The

2     Black case, Fox Searchlight, there was a company memo in that

3     case saying we need to scale back on overtime, we need to scale

4     back on temporary paid employees, and the unpaid intern program

5     would double in size.  That would indicate arguably something

6     unlawful, arguably something uncommon under the Meyers case.

7          This case doesn't have anything like that.  Four

8     cookie-cutter, perfunctory declarations containing language

9     this court rejected.  The plaintiffs' own experiences seem to

10    be outliers, even within programming and shows.  There is, I

11    think, undeniably, very significant variance in the duties, not

12    that the duties are conclusive either, but if Ms. Tierney was

13    found to be an unpaid substitute for an employee on The Howard

14    Stern Show because she ran breakfast orders, the other

15    individuals that Ms. Tierney herself identifies in the record,

16    such as I'm referring to Exhibit AA attached to the second

17    Ambinder affidavit.

18          THE COURT:  AA.

19          MR. LAMPE:  Yes.  This was submitted with the reply.

20    Ambinder affidavit attachment AA.

21          THE COURT:  Okay.  This is the experience, not coffee?

22          MR. LAMPE:  What I want to call attention to in

23    particular is on the next page, your Honor.  This is music

24    programming.  This is someone who you might otherwise try to

25    compare, argue could be compared or allow plaintiffs to be

B7STIEC

1    compared to Ms. Tierney.

2          This is an individual like many of the individuals who

3    are going to go in an area directly relevant to what they're

4    doing at Sirius.  He indicates the student of the Connecticut

5    School of Broadcasting that was given the basic skills and

6    radio boards, and to earn the trust of the team and get to work

7    on projects, such as cutting out video or audio from the day's

8    program to screen calls.

9          This sounds an unlawful lot like <u>Walling</u>.  He goes on

10   in the paragraph, in the coming weeks, I will be familiarized

11   with board operations and cutting promos, and I couldn't be

12   more excited.  He closes:  The office atmosphere and in-studio

13   excitement at Sirius is tremendous.  I can't wait to continue

14   this educational journey and see what lies ahead.

15         This is completely different from Ms. Tierney, who is

16   fetching breakfast orders; undeniable difference.  Intern Joel

17   referenced in AA lines up squarely with <u>Walling</u>.  This is

18   plaintiff's own evidence your Honor.  This isn't anything we

19   submitted.

20         Again, I'll close with the point, the plaintiff bears

21   a burden uniformly throughout the class.  Some arguable

22   suggestion that that common policy throughout the class is

23   unlawful, and plaintiff has not establishes either of those

24   elements here.  It is a low burden, but it has not been met.

25   We argue the motion should be denied.

B7STIEC

1              Thank you, your Honor.

2              THE COURT:  Okay.

3              Ms. Luncher.

4              MS. LUSHER:  Thank you.

5          I would like to start out just by staying that,

6     respectfully, all of the defendant's argues go to either merits

7     or credibility, which this court is not supposed to examine at

8     this initial stage of our motion.

9          I would like to distinguish some of the cases that

10    have been pointed out.  For example, in <u>Black</u> and in <u>Wang</u>,

11    significant discovery had occurred in both of those cases.  In

12    <u>Wang</u>, they were moving for 216(b) conditional certification,

13    but the defendants had made a motion to strike the class

14    allegations, the collective and class allegations from the

15    plaintiff's complaints so Judge Baer authorized them to do some

16    discovery on the case.  There hasn't been any discovery in

17    this.

18             THE COURT:  Right.  But as your opponent points out,

19    you decided when to make the motion for collective

20    certification.

21             MS. LUSHER:  Absolutely.  That is true.  But that is

22    we are simply following suit of the way that courts in the

23    circuit have talked about, how plaintiffs make this initial

24    motion just to send out a notice because statute of limitations

25    for individuals claimants are ticking every day.

B7STIEC

1          The court doesn't have to make a determination on

2     whether or not people are actually similarly-situated.  The

3     court looks at the evidence that is then submitted, which

4     courts have said can be relied upon pleadings and affidavits of

5     plaintiffs, to see whether or not they're similarly situated, a

6     general rule to send out a notice.  That is all we want to do

7     in this case.

8          As far as <u>Black</u>, I think Judge Pauley did this

9     wonderful treatment of <u>Walling</u> in that case.  <u>Walling v.</u>

10    <u>Portland Terminal</u> has been something that all of the courts

11    have discussed.  Again, I think that it goes to the merits and

12    so the courts haven't gotten into the DOL factors.

13         If you do look at <u>Walling</u>, what happened there is the

14    court decided that the Supreme Court decided those individuals

15    were trainees under the law, which is slightly different from

16    interns.  But even given the defendant's argument about this,

17    what happened is that the individuals were brought in for a

18    week of training that the brakemen for the company had to stand

19    back and watch these individuals while they went through the

20    training.  Then these individuals went into a pool.  If they

21    were later hired by the company, they actually got paid for

22    that training that they were not paid for before.  I think that

23    is a significant difference in that case.

24         But I think, importantly, Judge Pauley points out that

25    one the major things that the Supreme Court found was that the

B7STIEC

Portland Terminal Company did not derive any immediate

advantage from the trainee's work and that has been relied upon

in case after case particularly with these intern cases, the

company derives an immediate advantage, they should pay the

interns.

THE COURT:  What advantage did Sirius gain from the

interns?

MS. LUSHER:  These interns were performing work that

the company either would have had an already paid employee

perform or they would have had to hire someone to do them.

THE COURT:  Let's talk about Tierney.  So she seemed

to be a gopher, doing a lot of gopher tasks.

MS. LUSHER:  She did.

THE COURT:  Maybe they would have hired somebody, or

they would decided employees can get their own darn coffee.

MS. LUSHER:  Maybe.  I don't know if anybody wanted to

tell Howard Stern to do that.  I do think that she did some

gophering tasks.  The thing is that she also did some other

tasks, as well such as compiling data for the show.  She said

she worked with eight other interns.  These other interns could

have been handling the call screening that a lot of these

interns have talked about in their different declarations and

their blog space.  That seems be a very common thing.

In radio programming, it is a vital, integral part of

that radio programming happening.  If you have callers -- you

B7STIEC

1   have people calling in all the time to these radio shows, a lot

2   of them are talk shows, you know, and so somebody has to screen

3   those calls.  To me, that is an integral part of that

4   day-to-day radio show.

5         You know, the other thing is we are only talking about

6   five  locations here.  Sirius has buildings in five locations

7   that are New York, DC, LA, Nashville, and New Jersey.  While

8   they may have multiple studios in the same building, these

9   interns are working on multiple shows because they get booked,

10  the studios get booked by different people in the same

11  building.  So you have interns doing the same things throughout

12  the day in the same areas.  They see other interns also doing

13  those same things.

14        Some of them greet guests, whether music programmers

15  got to greet them, get them coffee, whether they work in talent

16  liaison and greeting guests or maybe escorting them to the show

17  where they were going to speak, I do think there is a

18  commonality.

19        I think that also Ms. Tierney may have been doing a

20  little more gophering.  She still was doing things that were

21  integral to that show, that show that other interns that later

22  on also worked for The Howard Stern Show also had to perform.

23        You know, the defendants didn't point out that our

24  plaintiff, Mr. Goldberg, who worked in the Opie & Anthony show,

25  very similar, it is an on-air personality show.  He also

B7STIEC

1   screened calls, but he also said that he got the crew

2   breakfast, he got water and coffee for guests, he carried

3   package and made deliveries in addition to his other tasks of

4   archiving and cutting clips like some of the programmers do,

5   take portions of advertising reads.  A lot of these individuals

6   would take audio clips and use them for promos and for

7   contests.

8          So in our Exhibit AA, the one used to point out about

9   music programming Intern Joel, part of his job duties were to

10  cut up audios from the day's program, do call screening, and

11  cut the audio for contest promos.  Again, it is all similar

12  tasks that these individuals were doing.  Are they identical?

13  No, they're not, but they are similar, and they are also

14  basically grunt work that entry-level employees do.

15         And Sirius derived an immediate advantage from these

16  individuals' work and that's what makes this different from the

17  railroad brakemen in Walling.

18         This case is also different from MSG.

19         THE COURT:  How to you distinguish MSG?

20         MS. LUSHER:  MSG was also our case.

21         THE COURT:  I know.  A big disappointment for you

22  guys, I'm sure.

23         MR. AMBINDER:  It certainly was.

24         MS. LUSHER:  I could say a lot about MSG.  All I will

25  say is that, you know, I think the court really focused on the

B7STIEC

fact that there wasn't enough evidence of a highly centralized

program.  The individual that was a named plaintiff worked at a

Rangers practice facility that was off site, as compared to the

majority of interns tends that worked at Penn Plaza.

His tasks, the court found, were significantly

different from the tasks that would be performed by the

majority of interns that may have been working in the

promotions department at Penn Plaza.  I also think that the

court really did focus on this highly centralized HR program

but there just wasn't enough evidence of it that was submitted

forth.

One of the hardest problems --

THE COURT:  I'm sorry.  That is the biggest difference

between the record that you put together for MSG and the record

you put together here is you focused on the centralization of

the program via the human resources department?

MS. LUSHER:  Absolutely.  I think that the

defendant's declaration from Bonnie Yuen backs that up

tremendously.  She admits they have control of everything.

Actually, this case is so much more like Grant and

also Mark and also Ojeda, because I have to tell you, that in

Grant and in Ojeda, those individuals, there were four or five

opt-in plaintiffs in both of those cases, and each worked in a

different department.  As I already mentioned, in Ojeda, the

two named plaintiffs, one of them worked in New York City in

B7STIEC

1   the web digital development department, and the other one

2   worked in California in the human resources department.  Yet

3   another opt-in plaintiff that worked in marketing in New York

4   City, yet another individual that was in public relations in

5   New York City, and then another person that worked in HR IS,

6   which is like human resources information systems.

7             In Grant, you had four plaintiffs.  You had one that

8   worked in -- that was the named plaintiff -- and he worked in

9   the pop radio promotions department.  You had an opt-in

10  plaintiff that worked in product department and business

11  analytics.  You had an individual who worked in promotions and

12  video.  And then another individual that worked in the urban

13  section of the artist and repertoire department.

14            THE COURT:  What?

15            MS. LUSHER:  Artist and repertoire.

16            THE COURT:  Artist and repertoire.

17            MS. LUSHER:  These individuals all testified to having

18  worked in different departments in different locations, they

19  have different supervisors, but that is where I think that

20  Judge Gardephe really honed in on the fact that it didn't

21  matter that they were performing different tasks.  The

22  similarity was they were all performing entry-level work that

23  compensated employees in their department performed.  That's

24  all the plaintiffs had to show was that was the common

25  allegation that violated the FLSA.  That is all that had to be

B7STIEC

shown to send out a notice to people just to say, We have a

case; if you want to join, you can.

            But your statute of limitations is ticking, as I said

before.  These aren't long-term employees just going to lose a

few weeks off the claim.  You have individuals, the summer

individuals, that interned over three years ago, they can't be

a part of the class anymore.

            THE COURT:  Right.  So let me ask you a question.  If

I were to agree that the case should be certified, one of the

things that the plaintiffs had asked for is information on

Social Security numbers of the class members.

            MS. LUSHER:  We will drop that.

            THE COURT:  Okay.  Thank you.  But let me ask my

question.

            MS. LUSHER:  Okay.

            THE COURT:  What have you done with the Social

Security numbers?

            MS. LUSHER:  Part of what we want, the sole reason we

wanted the Social Security number is for a skip trace to be

performed.  What we have done in other cases is, you don't have

to give it to plaintiff's counsel.  There can be a

confidentiality agreement with the claims administrator, where

the claims administrator is provided with Social Security

numbers, so that when a notice gets returned -- these

individuals move around so much, right?  They're college

B7STIEC

1    students.

2              THE COURT:  Yes.

3              MS. LUSHER:  So oftentimes they may give a home

4    address of parents.  They may give a school address.  It can be

5    difficult to --

6              THE COURT:  Find them.

7              MS. LUSHER:  -- to find them.

8         So we have asked courts before for Social Security

9    numbers.  I guess I jumped the gun too quickly.  Sometimes

10   there can be privacy concerns, and we recognize them.

11             THE COURT:  Yes.

12             MS. LUSHER:  We have had, in the <u>Viacom</u> case actually,

13   the court required that the claims administrator sign a

14   confidentiality agreement and that the Social Security numbers

15   were given to him to simply to perform a skip trace of the

16   individual to find a proper address to make sure that notice

17   was received by that person.

18             THE COURT:  All right.  At least I understand.

19             MS. LUSHER:  Right.  That was only after the notice

20   had been returned, as they were provided.  Once the notices

21   would come back, then the Social Security numbers would be

22   given of those individuals.

23             THE COURT:  Understood.

24             MR. LAMPE:  Very briefly, your Honor.

25             Again, on the <u>Grant</u> case, there might have been

B7STIEC

 1    disparate positions there, but there was a common company issue

 2    directive that all of the interns would serve business

 3    purposes.  There is nothing like that in here.

 4              With respect to the HR department in this case --

 5              THE COURT:  You will agree it is centralized?  Sirius

 6    runs a centralized internship program?

 7              MS. LUSHER:  You can put that label on it.  To some

 8    degree it is true, some not.  Let me explain.

 9              THE COURT:  Okay.

10              MR. LAMPE:  Centralized in the sense that the HR

11    department is a central facilitator of the program, yes.  There

12    is one website.  They don't apply on multiple websites or send

13    out envelopes to multiple mail drops.  One website.  HR does an

14    initial screening and does inform the intern candidates of the

15    basic rules.

16              But then it goes to the departments, the channels, or

17    the shows.  Those are the people that do the interviewing and

18    the selecting.  And most importantly and most relevant for this

19    case, that is the departments and channels and the shows that

20    develop the program for that intern specific to their

21    circumstances.

22              THE COURT:  Well, but within the policy and parameters

23    as set by HR.  So if they wanted to pay their intern, even if

24    they wanted to, the Sirius internship is a unpaid internship

25    program that has to involve school credit, right?

B7STIEC

1            MR. LAMPE:  Correct.

2            THE COURT:  There are limits to the flexibility --

3            MR. LAMPE:  Yes.

4            THE COURT:  -- of a channel.

5            MR. LAMPE:  There is a framework and it is in the

6    declaration.  The framework includes, for example, that the

7    channels in the departments and their shows must train, teach,

8    supervise, and provide feedback, must evaluate.

9            THE COURT:  Sounds like they got good legal advice

10   what they were supposed to put in that policy.

11           MR. LAMPE:  The policy is, nonetheless, is centralized

12   as they are not to be fill-ins for regular employees, they are

13   not to do essential day-to-day functions.

14           THE COURT:  So it says that, but I have to say that,

15   from a radio perspective, answering the phone and doing these

16   audio cuts and things like that, strike me as central to what

17   the business of Sirius -- I don't subscribe to Sirius, I have

18   had rental cars with it.  I have an idea.

19           MR. LAMPE:  I come back to the Walling rationale.  The

20   fact that they're doing jobs that are essential, the brakemen

21   in Walling, the brakemen job is a central job.  The Supreme

22   Court said they could be doing the work through observation and

23   then actually doing that job under close supervision.

24           So any of these functions that counsel is describing

25   from doing cuts of clips to doing promotions work to doing HR

B7STIEC

1  work or to do any sort of work on the shows, production of the

2  shows themselves, you can certainly imagine that there could be

3  the experts who do this, who allow the interns to do it while

4  they watch.

5          That's not to say that they're eliminating any need

6  for the paid employees.  The paid employees, they have to be

7  mentors.  That is another one of the HR guidelines.  There has

8  to be a mentor to do all this.

9          THE COURT:  Mr. Lampe, your reading of _Walling_, it

10  seems to me, essentially eviscerates the law relative to

11  interns, because you're saying _Walling_ is so broad, that you

12  can't have interns that are servicing the needs of the company,

13  and that's fine.

14          MR. LAMPE:  The key --

15          THE COURT:  Where do you draw the line?

16          MR. LAMPE:  The key, your Honor, is supervision.

17  _Walling_ referred to close supervision.  So you can imagine the

18  main person stands back, he would otherwise have been doing it,

19  he stands back and he watches the intern and he gives them

20  pointers to teach them.

21          THE COURT:  But for that relationship, the guy would

22  be with the brakemen.

23          MR. LAMPE:  Exactly, your Honor.

24          THE COURT:  So they're not really getting any benefit.

25  The company gets no benefit from that.  They have got the guy

B7STIEC

1  on board standing right there that would otherwise pull the

2  switch.

3          MR. LAMPE:  And, in fact, arguably impeding the

4  operations, to some degree.

5          THE COURT:  That is not how I read what's happening

6  there.

7          MR. LAMPE:  Well, there is no evidence from plaintiffs

8  about what happened, your Honor.  That is my point.  All they

9  say is that one unadorned, unsupported statement, very short in

10  the four declarations, I did work that paid people did.  It is

11  the plaintiffs' burden.  They did not go on to say, i.e, no one

12  was supervising me, no one showed me how to do it.

13          THE COURT:  A couple of them -- it doesn't have to be

14  no one shows you how to do it.

15          MR. LAMPE:  No one supervised, even among their four

16  declarant witnesses.  Two don't say that.

17          THE COURT:  Two do.

18          MR. LAMPE:  Two do.  They have to show under <u>Hearst</u>

19  commonality classwide.  We are talking about a very large

20  diverse group here, and half of the --

21          THE COURT:  How many interns did they hire per term?

22          MR. LAMPE:  I don't have the exact figure, but I think

23  it is around 100, perhaps.

24          THE COURT:  It is 100 in these five locations?

25          MR. LAMPE:  Combined, I think, yes.

B7STIEC

| | |
|---|---|
| 1 | THE COURT:  So you have essentially got five |
| 2 | locations, maybe 20 employees, but it may not be average, maybe |
| 3 | more in New York and LA, and fewer in Nashville and New Jersey. |
| 4 | MR. LAMPE:  I think there would be more interns in New |
| 5 | York than the other places. |
| 6 | THE COURT:  Okay.  There is. |
| 7 | MR. LAMPE:  There is roughly 1,000 class members in |
| 8 | this case over a three-year period.  I don't have the exact |
| 9 | number, but it would be a large and very diverse group. |
| 10 | THE COURT:  Do you have a sense of how many are -- I |
| 11 | would think, if you want internship at Sirius, the reason you |
| 12 | want an internship with Sirius is you want to go into the radio |
| 13 | business.  The majority of the interns are in operative jobs, |
| 14 | as opposed to HR or finance-type jobs. |
| 15 | MR. LAMPE:  I don't have that breakdown, your Honor. |
| 16 | I'm sorry. |
| 17 | THE COURT:  Okay. |
| 18 | MR. LAMPE:  But, again, the point I come back to is, |
| 19 | the plaintiff bears the burden.  The plaintiff had an |
| 20 | opportunity to distinguish this case from the Walling case. |
| 21 | The plaintiffs' evidence doesn't really distinguish it at all. |
| 22 | It certainly doesn't prove that the Walling facts are |
| 23 | applicable either.  It is plaintiffs' burden and the plaintiffs |
| 24 | have not satisfied the burden. |
| 25 | Thank you, your Honor. |

B7STIEC

1              THE COURT:  Okay.  Anything else?

2              MS. LUSHER:  I mean, if your Honor has any specific

3     questions.

4              I will say that I do think that we have gone above and

5     beyond our burden.  We have shown that there are similarities

6     in the tasks people do by having declarations from New York and

7     DC and showing job postings in New York and other locations

8     that are all identical.  This is the same evidence that was

9     submitted in the other cases where notice was sent out.

10             While there may be some slight differences between

11     what these individuals could have been doing, whether it was in

12     HR or whether it was in a radio programming show, the common

13     factor is that they were doing work that the company derived an

14     immediate advantage from and that they would have or did have

15     paid employees diagnose the exact same work next to the

16     unemployed intern.

17             I respectfully disagree with my adversary's treatment

18     of Walling, just because in Walling, the major thing was that

19     the company did not derive any immediate advantage.  I do think

20     this goes to the merits.  Also, Walling was a vocational

21     training program.  The company's operations were impeded

22     because they couldn't operate during that time.  They just had

23     a week-long training program for people they could put into a

24     pool to later hire from later that they paid.

25             It is a different situation than having interns come

B7STIEC

1    in, perform work that is integral to this company's business,

2    not paying them, and then also that the company derived an

3    immediate advantage from their work.

4           It is not a vocational setting here.  There is not an

5    educational structure.  You walk in, you do radio programming,

6    you screen calls, you edit audio clips, the same thing I could

7    be doing if you hired me for an entry-level job.

8           THE COURT:  I think part of the defendant's objection

9    is that, other than the two affidavits saying I wasn't

10   supervised or I wasn't highly supervised, there is not the

11   equivalent -- the defendant's arguments is, for all they know,

12   the person who is sitting there answering phone calls has a

13   Sirius employee sitting right next to them listening to what

14   they're doing on the phone so that it is the equivalent of the

15   Walling brakemen standing next to the trainee brakemen and,

16   therefore, the company is not getting any benefit, they're just

17   letting the intern learn how to do what their employee would

18   otherwise be doing.

19          MS. LUSHER:  I think it would have been more like

20   Walling had the company had a fake setup where it is like a

21   vocational school, we are going to have a fake studio, you have

22   people sitting in there while I practice.

23          If your Honor is the on-air personality, I am the

24   intern screening calls, Mr. Ambinder is the supervisor sitting

25   next to me telling me what to do.  It is not live with Opie &

B7STIEC

Anthony.  It is not live with Howard Stern.  This is a practice

situation.  That's a vocational school.  That's an educational

setting.  There is the, oftentimes, a classroom component when

it is an educational setting, and some internship programs do

have a close classroom component.

          Again, the Supreme Court decision, while it has been

brought up in all of these intern cases, the closest thing we

have right now was really a trainee exception under the law,

not an unpaid intern.  There are six factors in that test that

were derived from Walling.  It is with close supervision may be

one of those factors, but whether or not the internship was for

the benefit of the intern and whether that company derived an

immediate advantage or its operations were impeded are also

very important factors that have to be considered.

          THE COURT:  I need about 10 minutes and then I'll let

you know what the answer is.

          MS. LUSHER:  Okay.

          (Recess)

          THE COURT:  Thank you.

          In light of your submissions and what I have heard

today, I am prepared to make a determination on the plaintiff's

motion.  I am going to grant the motion insofar as it seeks

authorization to send a notice to the putative group.  As I

will discuss in a minute, I have some concerns about the notice

that the plaintiffs propose, so the parties are directed to

B7STIEC

1    meet and confer on a proposed notice.

2         As you know, this motion focuses on the first step of

3    a two-step method for determining the appropriateness of FLSA

4    certification.  Plaintiffs' burden at this stage "is modest but

5    it is not nonexistent."  That is from Fraticelli v. MSG

6    Holdings.

7         While the modest factual showing cannot be satisfied

8    simply by unsupported assertions, it should remain a low

9    standard of proof because the purpose of this stage is merely

10   to determine whether similarly-situated plaintiffs do, in fact,

11   exist.  That is from the Grant case.

12        Plaintiffs can meet their burden by presenting

13   evidence that there are other individuals with similar

14   positions, job requirements, pay provisions, and the like.

15   There must be an identifiable, factual nexus which binds the

16   named plaintiffs and the potential class members together as

17   victims of a particular practice.  That's from the Mark v.

18   Gawker Media case.

19        At a later stage, on a more developed record, the

20   named plaintiffs will be required, of course, to prove that the

21   opt-in plaintiffs are, in fact, similarly-situated to the named

22   plaintiffs.  At this preliminary stage, however, the real

23   question is whether Sirius', quote, policies or decisions

24   likely allow a single answer to the question of whether the

25   interns were treated more like ordinary employees or instead

B7STIEC

1    students or trainees.  That's from the <u>Mark</u> case.  My answer in

2    this case is yes.

3         In similar cases, courts have relied on the Department

4    of Labor's six-factor test to indicate what factors may be

5    relevant to the merits inquiry, therefore, to identify

6    questions to which members of the putative collection should

7    have similar answers.  That's from both <u>Mark</u> and <u>Grant</u> and

8    <u>Fraticelli</u>.

9         Also relevant is the Supreme Court's decision in

10   <u>Walling v. Portland Terminals</u>, which we have discussed at some

11   length, in which the court laid out the scope of the definition

12   of employee excluding individuals who, without promise or

13   expectation of compensation, but solely for purpose or

14   pleasure, worked in activities carried out by other persons

15   either for their pleasure or profit.

16        The parties are familiar with the six factors

17   identified by the Department of Labor, so I will not repeat

18   them.  The DOL factors are most important at this stage in

19   helping to assess whether the answers to each question would be

20   more or less the same across the putative collective.

21   Recognizing that, in any large endeavor, no two interns will

22   have exactly the same experience.  The defendants rely on Judge

23   Furman's determination in <u>Fraticelli</u> by arguing that the

24   interns varied placements meaning that their internship

25   activities are too different to merit similar treatment.

B7STIEC

1          In <u>Fraticelli</u>, Judge Furman, analyzing interns who

2     worked at Madison Square Garden, wrote that, "The  MSG interns

3     have worked in approximately 100 different departments and

4     their experiences appear to vary greatly from one department to

5     the next in ways that are highly relevant to the Department of

6     Labor's factors."

7          Unlike <u>Fraticelli</u>, however, the record in this case

8     does not include the lead plaintiffs concession, quote, that

9     the activities he performed were entirely different than those

10    of other interns because his department was very different.

11    Instead, Melissa Tierney, alleged that other interns performed

12    many of the same tasks that she was assigned, and that Sirius

13    treated other interns in a manner similar to how she was

14    treated.  I assume that defendants are right that the work that

15    the interns performed differed to some extent depending on the

16    department, channel, or show to which they were assigned.

17         Finance interns, like Andrew Vong, spent more time

18    working with spreadsheets than their counterparts on The Howard

19    Stern show, like William Latin.  But as Judge Gardephe wrote in

20    <u>Grant</u>, "The court routinely authorized notice in FLSA actions

21    even where potential opt-in plaintiffs worked at different

22    locations and performed somewhat different duties and are

23    managed by different supervisors."

24         The similar cities across the Sirius internship

25    program must only constitute a, "modest factual showing," that

B7STIEC

1    Sirius' internship program was a common policy or plan that

2    violated the law.  Like the internship programs at <u>Gawker</u>,

3    <u>Viacom</u>, and <u>Warner Music Group</u>, Sirius' program is run through

4    a centralized website that lays out the requirements for

5    interns and permits applications to each of the companies'

6    offices.  Websites like this imply that applicants were

7    evaluated according to common criteria and may have been

8    subject to common policies.  Thus like <u>Mark</u>, <u>Grant</u> and <u>Ojeda</u>,

9    courts all found court-ordered notice to be appropriate.

10          Moreover, defendants present a declaration from Bonnie

11   Yuen, the manager of the internship program at Sirius XM Radio.

12   Ms. Yuen lists a number of policies that apply to all Sirius

13   interns, including the requirement that an intern must receive

14   academic credit to participate and that all internships occur

15   on Sirius' centralized schedule, which provides for three

16   annual sessions.

17          Ms. Yuen further notes that Sirius' HR department

18   calls all potential interns to inform them that the internship

19   is unpaid, that a school must provide academic credit, and that

20   the student must work a minimum number of hours approximately

21   20 to 30 hours per week.

22          The evaluation process for all interns is the same and

23   interns are all required to submit journal entries to human

24   resources.  Ms. Yuen describes a number of other policies, some

25   of which may ultimately favor the defendants on the merits, but

B7STIEC

1    all of which constitute centralized policies regarding Sirius'

2    internship program.  This stands in contrast to Fraticelli,

3    where the evidence of a centralized MSG wide policy was only a

4    copy of the code of conduct that applied to all MSG employees,

5    standardized time sheet with intern at the top, a script that

6    interns were given to help manage telephone calls.

7         In Grant, Judge Gardephe concluded that similar

8    evidence to what we have in this case made it reasonable to

9    infer that the policy of classifying student works and unpaid

10   interns, and thus except from the FLSA wage and overtime

11   requirements, reflected a national companywide policy.

12        The same is true here.  Defendants will have the

13   opportunity to move to decertify the collective after the close

14   of discovery.  But for now, plaintiffs have made the modest

15   showing that the first stage requires.  As to the method and

16   content of the proposed notice in context, the plaintiffs'

17   papers have indicated that they are happy to work with the

18   defendants on the content of that notice, and I will encourage

19   to you do so.  It seems to me that the notice can be sent by

20   U.S. mail and by e-mail, it is not clear to me why it is

21   necessary to text it.  I would just note that.

22        I also think that the notice should inform the

23   potential opt-in that they may well have to provide discovery,

24   that this is not a completely painless process if they opt-in,

25   there may be some cost associated with being a plaintiff in the

B7STIEC

1   lawsuit.  They should also provide contact information for

2   defense counsel, just in case they want to hear from their

3   employer or their potential employer before they make a

4   decision whether to opt in.  Beyond that, I don't have any

5   other thoughts on the notice.

6            How long will it take the parties to meet and confer

7   on a revised notice?

8            MS. LUSHER:  Two weeks, your Honor.

9            THE COURT:  Is two weeks acceptable?

10           MR. LAMPE:  That's fine, your Honor.  Thank you.

11           THE COURT:  That takes us to November 21.  If the

12   plaintiffs can send a revised notice on November 21, preferably

13   that is on consent, but if not, if also on the 21st, if you can

14   send me your objections to their notice.

15           MR. LAMPE:  Yes, your Honor.

16           THE COURT:  Anything further?

17           MR. AMBINDER:  No, your Honor.

18           MS. LUSHER:  No.

19           MR. LAMPE:  No.

20           THE COURT:  Thank you all very much.

21                              - - -

22

23

24

25